## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HARRIER TECHNOLOGIES, INC.,

                            Plaintiff,

                - vs. -

CPA GLOBAL LIMITED and
CPA GLOBAL NORTH AMERICA, LLC,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.: 3:12-cv-167

**COMPLAINT**

Jury Trial Demanded

Plaintiff, Harrier Technologies, Inc. ("Harrier") by its attorneys, hereby alleges as follows:

## THE PARTIES

1.     Harrier is a Delaware Corporation with a place of business located at 67 Holly Hill Lane, Greenwich, CT 06830.

2.     CPA Global Limited, formally known as Computer Patent Annuities Limited, is a corporation registered to do business in the Island of Jersey, Channel Islands, with a place of business at Liberation House, Castle Street, St. Helier, JE1 1BL, Jersey, Channel Islands. Upon information and belief, CPA Global Limited transacts business in the District of Connecticut, by the offering for sale and selling of its products and services to customers located in this District, including its customer Harrier.

3.     CPA Global North America, LLC, formally known as Computer Annuities North America, LLC, is, upon information and belief, a corporation registered to do business in the Commonwealth of Virginia, and a wholly owned subsidiary of CPA Global Limited with a place

of business at 2318 Mill Road, Alexandria, Virginia, 22314.  Upon information and belief, CPA Global North America, LLC transacts business in the District of Connecticut by offering for sale and selling its products and services to customers located in this District, including its customer Harrier.

4.     Both CPA Global Limited and CPA Global North America LLC may be referred to hereafter as "CPA" or "Defendants".

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338(a), 28 U.S.C. § 1332(a) and 28 U.S.C. § 1367.

6.     Venue is appropriate in this Judicial District pursuant to 28 U.S.C. § 1391(d) in that CPA Global Limited is an alien and 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Harrier's claims occurred in this District.

## SUMMARY OF CLAIMS

7.     Harrier is a company that has designed and developed a breakthrough technology for use in the petroleum industry and has protected that technology with a series of patent filings on a worldwide basis.  Defendants are a worldwide intellectual property management company that inter alia, provides patent renewal services for individuals and companies around the globe.

8.     The patent renewal services provided by Defendants includes making annual annuity payments on behalf of their clients to National Patent Offices, which annuity payments are required by many countries to be paid subsequent to the filing of a patent application in that country.  Failure to make such payments when required results in the lapse of the patent

application and the loss of any patent rights. Harrier retained Defendants to make such annuity payments for its patent portfolio on a worldwide basis, including the annuity payments required for a Harrier patent application filed in Saudi Arabia.

9.      Defendants failed to timely pay a required annuity payment for the Harrier patent application filed in Saudi Arabia, resulting in the irrevocable loss of those patent rights with no possibility of revival. Defendants have admitted that the failure to pay the annuity resulted from a flaw in CPA's computerized annuity payment system.

10.      Harrier has sustained substantial damage to its business due to the actions of Defendants in failing to timely pay the required Saudi annuity as the patent application that lapsed was, and is, Harrier's most important intellectual property asset, and Saudi Arabia is Harrier's most important market for its breakthrough technology.

## STATEMENT OF FACTS

### Background and Description of The Harrier Artificial Lift Technology

11.      Harrier was founded in 1994 by Mr. Bruce Morrow and Mr. Lee Miller for the purposes of patenting and developing the Geared Centrifugal Pump ("GCP'). The GCP is an oil well pumping system developed for high volume artificial lift and is patented worldwide.

12.      The term artificial lift refers to the use of artificial means to increase the flow of liquids such as crude oil from a production well. Most oil production reservoirs initially have sufficient pressure potential to naturally force oil and gas to the surface during the early phases of production, as oil and gas are relatively light. Water, which is much heavier than oil, will eventually seep in to the production reservoir as the reservoir is depleted, naturally causing all

wells to stop flowing. At some point therefore, all oil wells need to implement an artificial lift plan to continue or increase oil production.

13.     One traditional method of producing artificial lift in the oil industry has been the use of the Electric Submersible Pump, known as the ESP in the oil industry. The ESP consists of a downhole pump, a downhole electric motor to drive the pump, a separator or protector to prevent oil from entering the electrical motor and a control panel on the surface. The basic ESP technology was invented in 1916 by Armais Arutunoff. Although the technology has been improved since 1916, the ESP being used today is essentially the same design invented by Mr. Arutunoff in 1916 and can be found in oil fields all over the world.

14.     ESP's are widely used because they can handle a wide range of flow rates and can provide the necessary artificial lift for oil wells as deep as 10,000 feet. However the ESP also has inherent disadvantages as the electric motor to drive the pump is placed in the well along with the pump. This leads to motor failures and substantial maintenance and replacement costs due to (1) oil or water entering the motor, (2) damage to the motor and the electrical wiring due to high temperature in the well, (3) damage from lightning strikes which can cause power surges that destroy the motor and (4) the expense and power loss associated with providing a power cord as long as 10,000 feet extending from the surface to the motor.

15.     Another disadvantage with the ESP system is that the downhole motor driving the downhole pump is cooled by the oil being pumped. If the oil contains a high concentration of gas, which is not uncommon in many wells, fluid flow is decreased leading to motor overheating and motor failure. Any motor failure of course requires that the motor and pump be removed

from the well for repair or replacement thereby causing a delay in production and additional expense to to the well owner.

16.    Mr. Bruce Morrow, who holds a Bachelor of Science degree in Geology and a Master of Science degree in Petroleum Engineering from Stanford University, recognized the problems inherent with the ESP and co-founded Harrier with Mr. Lee Miller to design and develop an alternative to the ESP that would eliminate the ESP's problematic disadvantages. That alternative is the GCP Artificial Lift System.

17.    Although Mr. Morrow had the technical expertise to design and develop the GCP as an alternative to the ESP, he also understood that the GCP technology would be competing with the ESP on a worldwide basis and that his inventions had to be protected worldwide. Therefore Harrier needed international business and intellectual property expertise in order to make the GCP a viable competitor to the widely used ESP and to protect Mr. Morrow's inventions.

18.    Mr. Miller holds a Bachelor of Arts degree and an MBA from Stanford University, and has an extensive background in creating an international business in which intellectual property protection is a priority. Mr. Miller was the founder of Alusit Holdings LP, which owned the intellectual property rights to to the Aluglas transfer metallization process. Mr. Miller protected the Aluglas process by filing and obtaining numerous Aluglas patents in over 50 countries and licensed the technology to major companies around the world including Wrigley, Hallmark, British American Tobacco, Ministry of Metallurgy of the USSR and Japan Tobacco, to whom Alusit was sold in 1996. Mr. Miller has also bought or started more than 10 other

companies, all of which benefited from his international business expertise, and his extensive experience in protecting intellectual property on a worldwide basis.

19.     The GCP Artificial Lift System, invented by Mr. Morrow, is a high volume artificial lift system that provides the flexibility and lift capacity of an ESP, but with improved energy efficiency, greater reliability and a substantially lower purchase and operating cost.  The inherent disadvantages in the ESP are eliminated with the GCP system because it places only the pump portion at the bottom of the oil well, the motor driving the pump is on the surface and the motor is connected to the pump with a downhole transmission of unique design.  In addition the ESP problem when pumping oil with high gas concentration is solved because the motor is on the surface and the transmission does not require cooling from the oil being pumped.

20.     Very early in the development phase of the GCP, Harrier recognized that the transmission connected to the pump was the critical component.  It was clear that a transmission small enough in diameter to fit inside a normal oil well casing, but still transmitting significant power with reliability, could not be built using conventional gearing technology.  Such a transmission had to include a gearing arrangement so that the rate of rotation of a shaft at the well bottom to drive the pump, would be substantially greater than the rate of rotation at the motor on the surface.

21.     One possible solution to implement an appropriate gearing arrangement was to use multiple gears on a common shaft wherein each set of engaging gears would transmit a relatively low load and a greater rate of rotation, but the combined load transmitted by a plurality of sets of engaging gears on a common drive shaft would be relatively large.  However, Harrier early on in the development process discovered that due to gear manufacturing tolerances,

multiple gears on a drive shaft are not likely to be perfectly aligned with other corresponding gears on the driveshaft.

22.    When load is applied, sets of gears on the drive and driven shafts, are not likely to simultaneously mate.  This imperfect alignment results in sets of gears on the drive and driven shaft to engage unevenly.  This results in one or more sets of gears to be loaded higher than its design load with resulting premature failure due to excessive load or wear.  Therefore to build a successful transmission having multiple gears on a common shaft, one would need very precise gear tolerances which in practice is not possible.

23.    Mr. Morrow solved this difficult and unique mechanical engineering problem by designing a transmission having pairs of helical gears mounted on a splined drive shaft with engaging pairs of helical gears mounted on a parallel splined driven shaft.  Each half of a pair is cut in the opposite sense, the two halves are not attached and are free to move axially relative to one another on the splined shafts.  If a load is imposed the first thing to happen, before any significant rotation in either the drive or driven shaft, is that the gears, reacting to the tooth loads, move axially along their respective shafts until they bump into one another.  At this point the gears would begin to bear increasing but varying tooth loads, depending upon the relative and uneven timing of each gear.  The gears that bear the higher loads push axially more strongly than their neighbor gear, moving away from engagement, while at the same time pushing those neighbor gears into more engagement.

24.    This process continues along all the gear pairs until the axial forces are opposite and equal, at which time lateral movement stops.  Since the axial force of a helical gear is proportional to the torque load on the gear, when axial forces among the gears are balanced, gear

torsional loading is also balanced so that load sharing among the gear pairs is equal. This novel and unique gearing system allowed the design and construction of a highly efficient parallel shaft multi-stage transmission small enough in diameter to fit inside a typical oil well casing, but having capabilities equivalent to those provided by an ESP, while at the same time completely eliminating the disadvantages inherent in the ESP design.

25.    Harrier has applied for and received a number of patents covering the GCP system, but the patent on the transmission, referred to hereafter as the Paired Helical Gearing ("PHG") patent is by far the most important patent in Harrier's portfolio of patents. The PHG patent issued in the United States as U.S. Patent No. 5,927,147, a copy of which is attached hereto as **Exhibit A**. The PHG patent has also issued in Argentina, Canada, China, Israel, Mexico, Pakistan, Thailand, Austria, Belgium, Switzerland, Cyprus, Germany, Denmark, Finland, France, Great Britain, Greece, Ireland, Italy, Luxembourg, Monaco, Netherlands, Portugal, Spain and Sweden.

26.    The PHG Patent did not issue in Saudi Arabia due to the actions of Defendants as described below. This has, and will continue to have, a significant adverse impact on the business of Harrier as Saudi Arabia is Harrier's largest and most important market.

**The Saudi Arabia Market**

27.    Proven oil reserves in Saudi Arabia are the second largest in the world, estimated to be 267 billion barrels. Saudi reserves are about one-fifth of the world's total conventional oil reserves, a large fraction of these reserves coming from a small number of very large oil fields. Although Saudi Arabia has around 100 major oil and gas fields, over half of its oil reserves are contained in only six giant oil fields, including the Ghawar Field, the biggest oil field in the

world with an estimated 70 billion barrels of remaining reserves. Ninety percent of Saudi Arabia's oil production comes from five fields and up to sixty percent of its production comes from the Ghawar field.

28. Saudi Arabia produced 10.3 Million Barrels per Day (Mbbl/d) in 1980, 10.6 Mbbl/d in 2006, and in the region of 9.1 Mbbl/d in 2010. Saudi Arabia maintains the world's largest crude oil production capacity, estimated to be approximately 12.5Mbbl/d at mid-year 2011. The six major Saudi oil fields are Abqaiq, Safaniyah, Zuluf, Berri, Shaybah and Ghawar. All six of these key oilfields were discovered over 30 years ago, and all of these fields, with the exception of Shaybah have been producing oil for three to five decades. Each of these fields have maintained high natural flow rates from a small number of oil wells by employment of a careful and rigorous program of water injection into the peripheral areas of these fields to keep reservoir pressures high and wells within these fields naturally flowing.

29. Over the years the oil column in each of these fields has steadily decreased while the amount of processed water emanating from wells in these key fields has steadily grown. The move from vertical wells to horizontal and multilateral wells have kept wellbores isolated from the steadily rising oil/water contact. But natural lift pressures have declined over the years and maintaining artificially high pressures through water injection is becoming less cost effective. Many wells in Saudi Arabia are now being produced with high capacity artificial lift methods and chief among these are ESP's.

30. The first ESP was installed in Saudi Arabian Field "Hawtah" in 1994. Currently there have been 625 High Volume ESP's installed in Saudi Arabia. Based on information published by Alkhorayef Petroleum (see **Exhibit B**), there are over 400 new ESP's to be

installed in the Kingdom over the next 12-18 months through existing purchase contracts and there are projected to be approximately 8,500 ESP's in the Kingdom by the year 2020. This in part is due to the number of new wells that will have to be drilled in order to maintain current production levels. If this estimate is correct, Saudi Arabia will arguably become the largest ESP market in the world as measured by revenue and profit by the year 2020. The Saudi market is estimated to total over 1.8 billion U.S. dollars by 2020, with continuing growth.

31.     The Geared Centrifugal Pump ("GCP Artificial Lift System") is designed to be a direct replacement for the ESP. The key differences between an ESP and a GCP is that the centrifugal pump of a GCP system is driven from a motor located at the surface and the same centrifugal pump of an ESP is driven from a motor directly attached to the pump at the bottom of the well. The motor of an ESP is connected to the electrical power grid at the surface by a long length of power cable installed in the well. The GCP by design is 10-15% more power efficient than an ESP. The operating reliability of a GCP is higher than an ESP due to it not having any electronics (motor/power cable) installed downhole. The life cycle cost of a GCP will be 25-30% lower than an equivalent ESP system.

32.     Harrier was well aware of the potential of the Saudi market at the time it filed the PHG patent application in Saudi Arabia and knew it had to protect its technology in that market. Harrier's strategy to protect its technology with patent filings was based on two criteria, (1) file in countries having the expertise to produce the GCP transmission and (2) file in the largest markets for its technology. Saudi Arabia was one of the few countries that satisfied both criteria as it is the largest market in terms of potential sales and the only country in the Middle East with a domestic manufacturer capable of copying the GCP Artificial Lift System. That domestic

manufacturer is Alkhorayef Petroleum which is the first manufacturer of the ESP artificial lift system in the Middle east and technically capable of duplicating the GCP Artificial Lift System absent patent protection in Saudi Arabia.

**Defendant's Actions Resulting In The Loss Of Harrier's Most Important Patent**

33.     At the time Harrier began filing for worldwide patents to protect the PHG technology it was using the intellectual property law firm of Kenyon & Kenyon LLP to handle its US and foreign patent filings.  The PHG patent was filed in Saudi Arabia in February 1999 through the Kenyon & Kenyon law firm, and given the Serial No. 99191107.  The patent regulations in Saudi Arabia, as in many other countries, requires that an annuity must be paid by the patent owner on an annual basis to keep a patent application alive.

34.     In Saudi Arabia, that annual annuity must be paid within the first three months of each year, with a three month grace period allowed, subject to the payment of a surcharge. However if the annuity for a patent application is not paid within the first three months, or within the grace period, the patent application is irrevocably deemed to have lapsed in Saudi Arabia and cannot be revived for any reason.

35.     Kenyon & Kenyon was vigilant about making sure that annuities were timely paid and would provide reminder letters to its clients.  An example of a reminder letter for the Saudi PHG patent application is attached hereto as **Exhibit C** along with Harrier's cover letter transmitting the necessary payment to Kenyon & Kenyon.

36.     Although Harrier sent the annuity payments directly to Kenyon & Kenyon, the actual payments made to foreign patent offices' were paid by Computer Patent Annuities, a firm retained by Kenyon & Kenyon to provide this service.  Computer Patent Annuities Limited and

Computer Patent Annuities North America subsequently changed their name to CPA Global Limited and CPA North America, the two named defendants in this litigation.

37.     Kenyon & Kenyon charged a service fee for the payment of annuities and as Harrier was paying annuities for a substantial number of patents and patent applications, it decided in March 2006 to directly retain CPA to pay the required annuities, and eliminate the Kenyon service fee.

38.     On April 28, 2006, CPA North America sent Harrier a formal engagement letter to the Harrier offices in Greenwich, CT to confirm the transfer from Kenyon & Kenyon and specifically "assume responsibility" for payment of the annuities for Harrier on a worldwide basis, commencing on May 1, 2006, and further agreed that "reminders for patents due after May 1, 2006 will come directly from CPA" (see **Exhibit D**).

39.     As set forth in Exhibit C, Harrier had paid the 2005 annuity for the PHG Saudi patent application on March 29, 2005, with a payment to Kenyon & Kenyon of $1,395.00. According to the Saudi patent regulations, the annuity for 2006 on the PHG Saudi application would have been due no later than June 30, 2006, which would include the Saudi grace period described above.

40.     CPA, pursuant to its contract with Harrier dated April 28, 2006 (Exhibit D), was responsible for paying this annuity and was also responsible for providing reminders to Harrier for patents due for renewal.

41.     The annuity renewal process required that CPA send a renewal notice to Harrier's Greenwich, CT office each time an annuity was due, and Harrier would provide instructions directly to CPA.  CPA would then send Harrier an invoice for the annuity payment which Harrier

would pay directly to CPA. This procedure was also used by CPA and Harrier for other Harrier patents and patent applications, in addition to the Saudi patent application.

42. CPA failed to provide a reminder to Harrier, failed to pay the 2006 annuity, and the PHG Saudi patent application, Harrier's most valuable patent, in the most valuable market in the world, irrevocable lapsed as of January 1, 2006.

43. Harrier had no knowledge that its most valuable patent application had lapsed in Saudi Arabia, as CPA did not inform Harrier, and Harrier dutifully paid the PHG patent annuity for 2007 pursuant to CPA's reminder and invoice.

44. CPA accepted the annuity payment for 2007 and confirmed its receipt (see **Exhibit E**). Harrier also paid the annuity for 2008 pursuant to CPA's reminder and invoice and CPA again accepted the payment and confirmed receipt (see **Exhibit F**).

45. Both the 2007 and 2008 payments were made when the PHG patent application had already lapsed in Saudi Arabia, but apparently CPA either had no knowledge of the lapse, or knew of the lapse and concealed it from Harrier, but in either case, it certainly did not notify Harrier.

46. On June 25, 2009, Harrier received a form notice from CPA (see **Exhibit G**) regarding the Saudi PHG patent application which stated in part;

> "We have received a communication indicating that according to the Patent Office records, this application has been abandoned or withdrawn, or has been deemed to be withdrawn or rejected as a result of failure to meet an official deadline".

As Harrier had been paying the required annuities and CPA had confirmed the payments, Harrier thought this notice was a mistake, but did ask Kenyon & Kenyon to check with CPA to determine the status of the PHG Saudi patent application (see **Exhibit H**).

47.     On September 9, 2009, Harrier received a second notice from CPA (see **Exhibit I**) regarding the PHG Saudi patent application, again stating that according to Patent Office records, the application had been abandoned.  Harrier immediately responded on September 21, 2009 informing CPA that according to Harrier's records, the PHG Saudi patent application was "CURRENT and HAS NOT been abandoned or withdrawn" (see **Exhibit J**).

48.     On January 15, 2010, Harrier finally received an email from CPA's head office (see **Exhibit K**) officially informing Harrier that the PHG patent application had lapsed as of January 1, 2006 for failure to pay the 7th annuity.

49.     CPA, in its email, clearly admitted that the 7th annuity had not been paid due to an error in CPA's computerized renewal system and apologized for its error.

50.     No explanation however was given by CPA as to why it continued to accept annuity payments from Harrier for a lapsed patent application, what happened to those annuity payments, and why it took nearly four years for CPA to discover its error.

51.     Incredible as it may seem, CPA sent Harrier another notice dated April 12, 2010, four months after telling Harrier that the PHG application had expired, confirming payment of an 11th annuity for the Saudi application, when obviously Harrier had made no such payment for an abandoned application (see **Exhibit L**).

52.     CPA also attempted to collect a $230 fee for the Saudi patent application from Harrier in February 2011, which Harrier refused to pay (see **Exhibit M**).

53.     The fact that CPA allowed the PHG Saudi patent application to lapse and the four year delay to even discover that the application had lapsed, came as a complete surprise to Harrier.  Mr. Miller had used the services of CPA for years with a number of his IP intensive companies, as CPA is the largest patent renewal service company in the world, and tells the world how reliable it is.

54.     On its website, CPA emphasizes its 40 years of experience in the business of patent renewals and proudly points out that it handles 1.4 million payments per year, "almost one third of all global patent renewals".  With 16 offices in 12 countries around the world CPA claims that it represents more than half of the world's top 50 patent filers.

55.     CPA is also keenly aware of the risks involved in missing annuity payments.  The following quotes from CPA's website demonstrate its devotion to avoiding and, indeed, mitigating a client's damages resulting from a missed annuity payment;

> "There is no room for error when it comes to the management of your intellectual property (IP) portfolio. Miss a renewal deadline or omit a legal formality and you can irretrievably damage the validity of your IP rights."

> "Divesting high-risk activities such as IP Recordals, renewals and docketing to CPA Global can reduce expense and increase a company's focus on the more substantive side of its IP work."

> "We also understand and take seriously the risk inherent in taking responsibility for patent maintenance. Our risk management strategy reflects this position and is unparalleled to any other patent renewal service provider. By partnering with CPA Global, risk to our clients' patent portfolio is mitigated through the following:

> • Operational compliance and business continuity programs supporting our patent payment service

- Our unique capacity to restore and re-register patents in the event of a lapsed case

- No limitation or exclusion of liability

- Professional indemnity insurance"

56.     All Harrier asks in this Complaint is for CPA to live up to its reputation and Website claims by fairly compensating Harrier for the loss of its most important patent application, in its most important market.

**Acceptance of The GCP Artificial Lift System By The Petroleum Industry**

57.     The GCP Artificial Lift System is a breakthrough in the petroleum industry and has been recognized as such by some of the biggest players in the industry.

58.     ConocoPhillips, the third largest integrated energy company in the United States and the fifth largest refiner in the world, with a market cap of $113 billion, has provided development funding for the GCP system. ConocoPhillips has funded numerous tests on the GCP system and the results of those tests are set forth in a paper co-authored by Mr. John C. Patterson, a ConocoPhillips Energy Advisor, Mr. Bruce Morrow, the GCP inventor, and Mr. Michael Berry, a Petroleum Industry Consultant (see **Exhibit N**). The conclusions, reached by these three experts in the petroleum industry are as follows:

"Conclusions

1.      The Geared Centrifugal Pump, GCP, is a new high volume lift system that combines the drive of a progressive cavity pump system and the multistage centrifugal pump of an ESP via a downhole speed increasing transmission.

2.      The heart of the GCP, the downhole transmission, incorporates paired helical gearing, PHG, that allows very high torque and horsepower, giving the GCP lift capacities competitive with ESPs.

3. The failures, connection at the stab-in connector and the leaking D tube, that occurred with the first installation in the test have been addressed and are not expected to present a problem for future installations.

4. The pump inlet in the GCP is below all other system components, allowing the fluid intake to be located below the producing perforations. This configuration provides greatly improved gas handling capability compared to conventional ESP installations.

5. All downhole components of the GCP are mechanical, allowing the GCP to be adapted to use in very high temperature environments, such as SAGD projects.

6. The GCP has proven to be very efficient in surface and downhole testing, and is expected to meet or exceed the energy efficiency of other high volume lift systems.

7. The PHG transmission can be easily adapted for use in an ESPCP system. Use of a PHG transmission would more than double the available power downhole, compared to the currently used planetary transmissions. In addition, the PHG transmission would allow the use of a rotary gas separator run at motor speeds - a capability not available with the existing designs".

59. The GCP Artificial Lift System was installed in a ConocoPhillips well in West Texas in May 2010 and has run without incident since installation for over 19 months. The GCP Artificial Lift System was also installed in a ConocoPhillips well in New Mexico in January 2011, and has run without incident since installation for over 12 months.

60. Harrier has a contract with Kuwait Oil, the national oil company of the Emirate of Kuwait, and Petroleum Development Oman, the national oil company of the Sultanate of Oman, for the installation of the GCP Artificial Lift System on three wells in Kuwait and six wells in Oman. Upon completion of a run-in period for the GCP in Oman, Harrier has been offered the Yibail field in Oman for a full scale installation of the GCP Artificial Lift System at an estimated

150-200 wells.  This Oman installation, when completed, including GCP installation, equipment and maintenance, is estimated to generate more than $100 million in revenue  on an annual basis. Oman is the 25th largest oil producer in the world, and Kuwait is the 10th largest oil producer in the world.  No agreement has yet been reached with Kuwait for a full scale installation, but it is anticipated that any Kuwait installation will be substantially larger than the Oman installation.

61.     Harrier was invited twice in 2011 by Saudi Aramco, the national oil company of Saudi Arabia, to present the GCP Artificial Lift System in Saudi Arabia.  Harrier has to date declined this invitation due to the failure of obtaining patent protection on the PHG transmission in Saudi Arabia, and the concern that the Saudi domestic ESP manufacturer, Alkhorayef Petroleum or other ESP manufacturers, will obtain access to the GSP and copy Harrier's technology. Harrier has also been contacted by a number of major oil field service companies and artificial lift companies for a license to the PHG technology.  Harrier had a two option plan to enter the huge Saudi market. Based on its success in Oman and Kuwait it could directly sell complete GCP Artificial Lift Systems to Saudi Aramco. Alternatively, utilizing the expertise provided by Mr. Miller and based on the proposals already received from potential licensees, it could license its PHG technology to companies in this market. That plan must now be abandoned due to the actions of Defendants.

## COUNT I-BREACH OF AGREEMENT

PLAINTIFF REPEATS AND RE-ALLEGES EACH AND EVERY ALLEGATION SET FORTH IN PARAGRAPHS 1 THROUGH 61 ABOVE AS AND FOR THIS COUNT I AS IF FULLY SET FORTH HEREIN.

62.     Under the terms and conditions of the engagement letter sent from CPA to Harrier on April 26, 2006 (Exhibit D) and CPA's subsequent and continuing service commitment and course of conduct in the payment of annuities for Harrier, there existed a binding legal agreement between CPA and Harrier under which, for good and valuable consideration, CPA agreed to assume responsibility for renewal of the Harrier patents and patent applications, including the PHG Saudi patent application, commencing May 1, 2006 and continuing thereafter and further assumed responsibility for providing Harrier with continuing reminders for patents due for renewal after May 1, 2006, which reminders would come directly from CPA.

63.     Harrier performed its obligations under the engagement letter by sending annuity payments to CPA in response to each reminder and fully paying any and all service charges imposed by CPA.

64.     CPA, by and through its agents, employees, and partners, breached the agreement between Harrier and CPA in at least one or more of the following respects:

a)     CPA failed to provide a reminder letter to Harrier that the 2006 annuity payment for the PHG Saudi patent application was due no later than June 30, 2006.

b)     CPA failed to pay the 2006 annuity payment for the PHG Saudi patent application on or before the due date of June 30, 2006, leading to the irrevocable lapse of the PHG Saudi patent application.

c)     CPA accepted and confirmed receipt of annuity payments from Harrier for 2007 and 2008 on the PHG Saudi patent application when it knew, or should have known, that the PHG Saudi patent application had lapsed on January 1, 2006, thereby delaying or preventing

any remedial action Harrier may have been able to take to preserve or revive any intellectual property rights it could have obtained in Saudi Arabia.

65. As a result of CPA's breach of its agreement with Harrier, Harrier has sustained substantial damages to its business in Saudi Arabia which includes, but is not limited to, (1) a substantial reduction in any potential share of the $1.8 Billion artificial lift market in Saudi Arabia, which Harrier could have obtained by manufacturing and selling the GCP Artificial Lift System into the Saudi market with the protection of its legal patent monopoly on the PHG transmission and (2) a complete loss of any potential licensing revenue due to the lapse of the PHG patent application in Saudi Arabia should Harrier have chosen to license its PHG technology to Saudi domestic manufacturers or to foreign manufacturers. The exact amount of such damages inflicted upon Harrier will be established at trial.

## COUNT II-BREACH OF FIDUCIARY DUTY

PLAINTIFF REPEATS AND RE-ALLEGES EACH AND EVERY ALLEGATION SET FORTH IN PARAGRAPHS 1 THROUGH 65 ABOVE AS AND FOR THIS COUNT II AS IF FULLY SET FORTH HEREIN.

66. Pursuant to the engagement letter sent from CPA to Harrier on April 28, 2006, and it's written acceptance to assume responsibility for the payment of Harrier annuity payments, and to provide reminders when such payments were due, CPA owed Harrier a fiduciary duty to perform the services it had agreed to perform.

67.     In taking the actions, and omitting to act as described generally above, but more specifically in paragraphs 33-54 CPA, by and through its agents, employees and partners, breached its fiduciary duty to Harrier.

68.     As a direct and proximate result of CPA's breach of its fiduciary duty, Harrier has been damaged as described in paragraph 64 and in an amount to be determined at trial.

## COUNT III-PROFESSIONAL NEGLIGENCE

PLAINTIFF REPEATS AND RE-ALLEGES EACH AND EVERY ALLEGATION SET FORTH IN PARAGRAPHS 1 THROUGH 68 ABOVE AS AND FOR THIS COUNT III AS IF FULLY SET FORTH HEREIN.

69.     CPA, on its website, advertises itself as the world's leading professional service provider, founded by attorneys in 1969, that provides an array of IP services to organizations across the globe in order to safeguard and maximize the value of IP assets while minimizing risk. These services include not only patent renewal services, but also include legal support services, litigation support, legal research and contract management.

70.     On April 28, 2006, Harrier and CPA entered into a professional service relationship whereby CPA agreed to assume responsibility for providing Harrier with continuing reminders for the payment of upcoming patent annuities, and for the timely payment of those annuities, specifically including the payment of the 2006 annuity for the PHG Saudi patent application.

71.     As a professional service provider, CPA, by and through its agents, employees and partners, had a duty to Harrier to possess and use the knowledge, skill and care ordinarily

used by reasonably careful service providers who also provide the same or similar services provided by CPA.

72. CPA, by and through its agents, employees and partners were professionally negligent in at least one or more of the acts or omissions to act as set forth in paragraphs 33-54 herein.

73. As a direct and proximate result of CPA's foregoing negligent acts or omission to act, Harrier has been damaged as set forth in paragraph 64 and in an amount to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Harrier demands a trial by jury on all of its claims.

## PRAYER FOR RELIEF

WHEREFORE, Harrier prays for judgment against Defendants as follows:

a) Granting Plaintiff judgment on its claims in an amount to be determined at trial, which is expected to be no less than $25 Million,

b) Awarding Harrier its costs and attorney fees, and

c) Awarding Harrier such other and further relief as this Court deems just and proper.

Dated: February 3, 2012          Respectfully submitted,
       Greenwich, Connecticut

                                 IVEY, BARNUM & O'MARA, LLC


                                 By:    /s/ Michael J. Jones
                                        Michael J. Jones, Esq. [ct09759]
                                        170 Mason Street
                                        Greenwich, CT 06830
                                        Telephone: (203) 661-6000
                                        Facsimile: (203) 661-9462
                                        E-Mail: mjones@ibolaw.com


                                           -and-


                                 CARTER LEDYARD & MILBURN, LLP


                                 By:    /s/ Keith D. Nowak
                                        Keith D. Nowak, Esq.
                                        2 Wall Street
                                        New York, NY 10005
                                        Telephone: (212) 732-3200
                                        Facsimile: (212) 732-3232
                                        E-Mail: Nowak@clm.com

                                        *Attorneys for Plaintiff*
                                        *Harrier Technologies, Inc.*