UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

HARRIER TECHNOLOGIES, INC.,
    Plaintiff,

v.                                                              3:12-cv-00167-WWE

KENYON & KENYON, LLP,
    Defendant.

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this action, plaintiff Harrier Technologies alleges that defendant Kenyon & Kenyon breached its fiduciary duty and committed fraud by concealing that Harrier's Saudi patent application for an oil extraction pump design had irrevocably lapsed. Harrier had retained Kenyon to oversee its patent renewals in various jurisdictions, and Harrier contends that Kenyon failed to pay the Kingdom of Saudi Arabia's annual renewal fee in 2006, which resulted in the loss of the patent. Thereafter, Kenyon concealed the lapse in payment and its corresponding responsibility for the lapse from Harrier. Harrier did not learn the full extent of Kenyon's responsibility until revealed through discovery in this case.[1]

Kenyon has now moved for summary judgment. For the following reasons, summary judgment will be granted in part and denied in part.

**Lack of Proximate Cause**

Kenyon argues that its breach of fiduciary duty or fraud was not the proximate cause of Harrier's loss of the Saudi patent application, as both causes of action stem from concealment that occurred after the patent application had lapsed. Harrier responds that it incurred damages

---

[1] Harrier had initially sued only a third-party intellectual property management company, which has since been dismissed from the case.

after the Saudi patent application lapsed, and that Kenyon breached its fiduciary duty not only by concealing the lapse but also by failing to make the 2006 payment in the first place.

The Court agrees that Harrier has adequately demonstrated damages resulting apart from lapse itself, based on Kenyon's concealment of the lapse. As detailed by Harrier:

> Harrier was damaged by Kenyon's covering up the patent's lapse because it continued to pay annuity fees on the Saudi Arabia PHG Patent after it had irrevocably lapsed.
>
> \*\*\*
>
> Kenyon's actions caused [Harrier] to waste valuable time and resources in a fruitless investigation to determine whether the patent could be restored, and delayed and complicated the instant litigation by obscuring Kenyon's culpability and attempting to have Harrier's claims against it dismissed based upon the fraudulent release and Harrier's delay in bringing suit against Kenyon. If Kenyon had informed Harrier in 2009 that it had already investigated what restoration procedures were available and had determined in 2006 that there were none, Harrier would not have spent time investigating this issue in 2009. Additionally, had Harrier known the full extent of Kenyon's knowledge and responsibility for paying the missed annuity, it would have brought suit against Kenyon at the same time it filed its initial complaint against CPA. Because Kenyon lied to Harrier and hid relevant information, Harrier did not file a lawsuit against Kenyon initially and was forced to later bring a contested motion to amend its complaint against Kenyon.

Kenyon replies that the "American rule" proscribes Harrier from collecting damages based on the burdens of litigation. See Rizzo Pool Co. v. Del Grosso, 240 Conn. 58, 72 (1997). But the rule, employed by Connecticut, merely disallows attorneys' fees to the successful party as a general principle of litigation. Id. It does not speak to the instant case, where Harrier alleges that Kenyon, in an effort to deflect, intentionally and fraudulently induced Harrier to sue another party. Considering that Harrier did not learn the extent of Kenyon's actions until discovery in this case revealed it, Harrier will be permitted to supplement or correct its damage disclosures. The parties may have additional time for discovery if necessary, and Harrier shall be permitted to demonstrate its concealment-based damages at trial.

Harrier next argues that Kenyon's failure to make the 2006 annuity payment itself was a breach of Kenyon's fiduciary duty because it resulted from Kenyon placing its own interests before those of Harrier.

Harrier characterizes Kenyon's failure of care as resulting from a failure of loyalty. Virtually any failure to use reasonable care could be framed rhetorically as a failure to adequately consider the interests of others, but Connecticut courts differentiate between a negligence claim – which implicates a duty of care, and a breach of a fiduciary duty – which implicates a duty of loyalty. See Beverly Hills Concepts, Inc., v. Schatz and Schatz, Ribicoff and Kotkin, 247 Conn. 48, 57 (1998). Here, Harrier's own valuation expert, Rosenfarb, explains in his executive summary that he calculated the damages "caused by the alleged *negligence* of Kenyon . . . for failure to pay the required annuity . . ." "This alleged *negligence* caused the irrevocable loss of Harrier's Saudi patent rights . . ." (emphasis supplied).

"Unlike breach of fiduciary duty claims, professional negligence claims implicate only a duty of care, rather than a duty of loyalty and honesty." Short v. Connecticut Community Bank, N.A., 2012 WL 1057302 *11 (D. Conn. March 28, 2012). Here, there is no allegation or evidence that Kenyon deliberately allowed Harrier's patent application to lapse or that Kenyon benefited from the lapse. Disloyalty was not the proximate cause of the patent application loss, as Kenyon did not advance its own interests by failing to pay the annuity. See Bozelko v. Papastavros, 323 Conn. 275, 283 n. 10 (2016) ("[A] plaintiff alleging a breach of fiduciary duty must show that any damages sustained were proximately caused by the fiduciary's breach of his or her fiduciary duty.").

3

Kenyon's alleged incompetence, not its disloyalty, was the substantial factor that caused the Saudi patent application to lapse. See 2 Nat. Place, LLC v. Reiner, 152 Conn. App. 544, 557 (2014).

> A review of the pleadings and evidence before the court reveals that the plaintiff's claim of breach of fiduciary duty sounds not in a breach of the defendant's duty of loyalty or honesty. Instead, the facts of this case evoke a question of whether the defendant fulfilled its duty of care—a cause of action the plaintiff did not plead.

2 Nat. Place, LLC v. Reiner, 152 Conn. App. 544, 557 (2014). As in Reiner, Harrier knowingly excluded a negligence cause of action from its complaint. Accordingly, Harrier may not recover negligence-based damages under the guise of its fiduciary duty or fraud claims. Kenyon's alleged breach of fiduciary duty and fraud were not the proximate cause of Harrier's loss of the Saudi patent. However, as discussed above, the Court will allow evidence of damages based on Kenyon's concealment of the lapse for purposes of Harrier's fiduciary duty and fraud claims.

**Speculative Nature of Lost Profits**

Kenyon argues in the alternative that Harrier's alleged lost profits are speculative and depend on numerous contingencies which may not occur and are unsupported by the facts. The Court agrees that Harrier has not proffered sufficient nonspeculative evidence to submit the issue to a jury. See Bridgeport Harbour Place I, LLC v. Ganim, 131 Conn. App. 99, 123 (2011).

Harrier responds that much of Kenyon's argument is simple disagreement with the conclusions reached by Harrier's experts. Harrier contends that "[a] damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence." See Beverly Hills Concepts, 247 Conn. at 70.

Harrier relies on the expert testimony of Rosenfarb, an accountant, to support its allegations of lost profits. Rosenfarb, in turn, relies on the opinions of a Mr. Al-Ajaji, who has worked in the Saudi oil industry for the past fourteen years.

Mr. Al-Ajaji determined the number of pump units that Harrier would have sold to Saudi Arabia had Harrier not been prevented from entering the market due to the lapsed patent application. Rosenfarb then multiplied that number by the expected sales price of the units to arrive at a gross revenue for sales. Servicing fees of $130,000 per well, per year, were then added, resulting in an estimated total lost revenue of approximately $85 million.

Harrier's calculations are not reliable because they represent purely speculative sales numbers based on Al-Ajaji's subjective opinion of Harrier's predicted market penetration. Al-Ajaji begins by asserting that Saudi Arabia indicated at a conference in 2012 that they would need 900 new artificial lift systems by 2020. Al-Ajaji then opines, based on the purported superiority of the product, that Harrier's pump system, "when proven in the Kingdom, will have the potential to obtain in Saudi Arabia an initial market share of 10-15% within a relatively short period of time (24-36 months) and over the long term (5+ yrs.) potentially obtain a larger share (20%-30%) of the artificial lift market previously served by ESP systems." Al-Ajaji further opines that if Harrier were to have sold its lift system in Saudi Arabia without patent protection, a local competitor could potentially copy Harrier's technology and replace Harrier as a supplier of lift systems to Saudi Arabia. Apparently this risk was so great that Harrier declined to enter the Saudi market altogether, foregoing tens of millions of dollars in revenue.

Rosenfarb uses Al-Ajaji's 10-15% market share estimate to predict contracts for "between approximately 90 and 135 wells" by 2020 (representing 10-15% of the 900 new lift systems). Rosenfarb then splits the difference to arrive at an estimate of 112 systems that would have been sold to Saudi Arabia within an initial 5 year period. Revenues of $405,500 per well were estimated based off of Harrier's "Saudi Proposal" that never came to fruition. Rosenfarb predicts that Harrier would have realized additional revenue of between $130,000 and $140,000

5

per well, per year, based upon the expectations of another of Harrier's experts, Mr. DeLong. Mr. DeLong does not provide a basis, other than his general industry experience, for how he arrived at his service revenue numbers.

Based on the predicted sales of the 112 systems, replacement of those systems every three years, and the corresponding service contracts, Rosenfarb estimates over $85 million in lost revenues. After subtracting expenses, Rosenfarb predicts lost profits of just over $8 million.

Kenyon responds that Harrier's alleged lost profits are speculative. The theoretical sales depend on numerous unsupported contingencies, the foremost being that Saudi Arabia would have behaved differently from Harrier's other potential customers, none of whom indicated lasting interest in Harrier's product. Indeed, the Court finds implausible that the only country that would have expressed significant interest in purchasing Harrier's supposedly superior product is the same country in which the patent application for the product was lost. If it is safe to assume that the Saudis would have spent over $80 million on the product, why hasn't any other potential consumer indicated similar interest? And if the lapse in the Saudi patent application is what prevented the sales, why hasn't Harrier sold its product in any of the jurisdictions where its patent applications did not lapse?

Kenyon points out that Harrier has never in its 20 years of existence declared a profit on its tax returns. Harrier's experts assert that Saudi Arabia would be sufficiently satisfied by tests of the product to assume, seemingly arbitrarily, 12.44% market penetration in the first five years (112 of 900 new wells). But Harrier's experts have never tested the product, and Kenyon stresses that the potential customers that have tested Harrier's product, in the United States and in Oman, were not impressed enough with its superiority to purchase more.

Al-Ajaji's testimony that the Saudis tend to be early-adopters of technology is not sufficient to move Harrier's evidence beyond the realm of speculation. Accordingly, the Court will not allow Harrier's evidence of lost profits.

**CONCLUSION**

For the foregoing reasons, Kenyon's motion for summary judgment [ECF No. 185] is GRANTED in part and DENIED in part. Harrier's concealment-based damages claims survive for trial, but evidence of lost profits and other negligence-based damages will not be permitted.

The Court will allow for an additional 60 days of discovery, which shall close by September 11, 2017. Jury Selection will be scheduled for September 25, 2017, with trial to follow.

Dated this 12th day of July, 2017, at Bridgeport, Connecticut.

/s/Warren W. Eginton
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE